**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 22-cr-148-RCL** |
| **RILEY KASPER,** | |
| **Defendant.** | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter.   For the reasons set forth herein, the government requests that this Court sentence Riley Kasper to 41 months' incarceration, 3 years' supervised release, and a special assessment of $100.   The recommended sentence reflects the midpoint of the applicable Guidelines range, which includes incarceration for a period of 37 to 46 months.   In addition, the government recommends that Kasper should be ordered to pay restitution in the amount of $2,000.

**I.     INTRODUCTION**

The defendant, Riley Kasper, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States

1

On January 5, 2021, Kasper, a 25 year-old, cellphone tower worker from Clintonville, Wisconsin, traveled to Washington, D.C., to protest the certification of the Electoral College vote by Congress on January 6, 2021.   Three days earlier, Kasper had posted a photograph of Donald Trump to his Facebook account with its direction to "TAKE AMERICA BACK" and "BE THERE WASHINGTON D.C. JANUARY 6, 2021 WILL BE WILD."   On January 6, 2021, he attended the "Stop the Steal" Rally near the Ellipse to the United States Capitol, and then, at approximately 12:55 p.m., Kasper joined the crowd a people who had amassed near the police line at the Peace Circle, to the west of the Capitol building.   He video-recorded the rioters who pushed and broke down the barriers at the Peace Circle, and, when a friend responded to his video by stating "[t]hat's nuts you were right there when they pushed that fence back lol," Kasper answered, "[f]uck yeah bro!   I didmt [sic] drive 14 hours for nothing."

After rioters broke down the barriers and broke the police line, Kasper advanced with the crowd and entered the restricted grounds of the Capitol.   He was armed with chemical "bear spray."   At approximately 1:50 p.m., Kasper held up the canister and deployed the bear spray towards United State Capitol Police and Metropolitan Police Department Officers who were attempting to maintain a perimeter on the Lower West Terrace.   Kasper then moved closer to the

---

Capitol was $2,923,080.05.   That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim.   MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum.   However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

officers and again deployed the bear spray at the officers, including Metropolitan Police Officer M.V.  Later, Kasper eagerly bragged on social media that "I pepper sprayed 3 cops so bad they got undressed and went home, gently brazed [sic] many others several times.  I basically organized my own little militia and we fucking took over Congress."  Kasper also stated, "I mean the rest of the crowd gave support, but as you can see in that video it was my group that busted the first gate and kept chasing the cops down and pushing them back into the capital [sic]."  He told friends that he found "something satisfying about pepper spraying cops in riot gear and watching them run from you like a bitch even though they have face masks, billy clubs and full fucking body armor."  After his arrest, Kasper again boasted that he held a can of pepper spray "like a fuckin' badass."

For his conduct, the government recommends that the Court sentence Kasper to 41 months of incarceration, which is the midpoint of the advisory Guidelines' range of 37-46 months.   A 41-month sentence reflects the gravity of Kasper's actions, his assault on officers, and also takes into account his acceptance of responsibility.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case, ECF 46, for a summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

**B.      Kasper's Role in the January 6, 2021 Attack on the Capitol**

*Joining the Riot*

Riley Kasper is a 25 year-old cellphone tower worker who assaulted law enforcement officers and participated in the January 6 attack on the Capitol.   His actions and the crime to which he has pleaded guilty are documented through body worn cameras from the Metropolitan Police Department, open-source video, and Kasper's own postings, in which he bragged about his actions and his assault on officers.

By his own account, Kasper spent 14 hours traveling from Wisconsin to Washington, D.C. to participate in the January 6 riot.   On January 2, 2021, he posted to his Facebook account a picture of the former president with the direction to "TAKE AMERICA BACK" and to "BE THERE" on January 6, 2021 in Washington, D.C., and that it "WILL BE WILD."



**Image 1**: "TAKE AMERICA BACK … BE THERE … WILL BE WILD" post.

4

Once in Washington, D.C., on January 6, 2021, Kasper attended the "Stop the Steal" Rally near the Ellipse and then moved with others along Pennsylvania Avenue toward the Capitol building.   Kasper was among the crowd at the Peace Circle at approximately 12:55 p.m., when rioters attacked United States Capitol Police Officers at the line and broke through the barricades and officers to gain access to the Capitol.   This was the first breach of the Capitol grounds' outer perimeter.   He recorded and posted images from the attack to his Facebook account on January 6, 2021, to show that he was part of the attack, including an image of an "Area Closed" sign and rioters pushing against fencing.



**Image 2**: Image from Kasper's Facebook post, showing "Area Closed" sign, fencing, and rioters approaching the Capitol on January 6, 2021.

Later on January 6, Kasper also sent a video of the riot to a friend via Facebook.   When

the friend responded, "[t]hat's nuts you were right there when they pushed that fence back lol," Kasper answered, "[f] uck   yeah bro!   I didmt [sic] drive 14 hours for nothing."

Kasper then continued to move with the rioters toward the Capitol.   The large crowd quickly overwhelmed law enforcement officers and pushed through other barricades that had been erected on the grounds.   Kasper wore a camouflaged facemask and head covering, a grey-patterned jacket and a camouflaged backpack.   In his right hand, he carried a canister of "bear spray" – that is, an aerosol spray commonly marketed as one designed to deter a bear attack.



**Image 4**: Hooded and masked Kasper holding a canister of chemical "bear spray."

United States Capitol Police and Metropolitan Police Department Officers attempted to establish a new perimeter within the Capitol grounds to prevent rioters from gaining control over the Capitol building.   Kasper made his way to the law enforcement perimeter guarding the Lower West Terrace.   At approximately 1:50 p.m., Kasper aimed and deployed chemical "bear spray" in the direction of law enforcement officers guarding the Lower West Terrace perimeter.



**Image 5:** Kasper deploying chemical "bear spray."

Body worn camera footage from MPD officers recorded Kasper deploying the chemical bear spray at officers.   The body worn camera attached to MPD Officer David Augustine captured Kasper deploying the orange-colored bear spray chemical at officers at approximately 1:50 p.m.



**Image 6:**   Still image from body-worn camera attached to MPD Officer David Augustine shows
Kasper deploying bear spray at law enforcement officers.

.

Body worn camera footage from MPD Officer Evan Douglas also captured Kasper

deploying bear spray against uniformed law enforcement officers at approximately 1:50 p.m.



**Item 7:**   Body-worn camera footage from MPD Officer Evan Douglas shows Kasper deploying bear spray at officers.



**Item 8:**   MPD Officer Douglas's body-worn camera shows Kasper one second before he deployed chemical bear spray at officers.

9

*Bragging About Assaulting Officers*

Kasper immediately bragged on social media about his attacks on law enforcement.   On January 6 and 7, 2021, he posted, "I pepper-sprayed 3 cops so bad they got undressed and went home, gently brazed [sic] many others several times.   I basically organized my own little militia and we fucking took over Congress."   He also wrote, "I mean the rest of the crowd gave support, but as you can see in that video it was my group that busted the first gate and kept chasing the cops down and pushing them back into the capital [sic]."   He also posted that "there is something satisfying about pepper spraying cops in riot gear and watching them run from you like a bitch even though they have face masks, billy clubs and full fucking body armor."

Kasper also wrote a message stating:

> As the day went on there were cops that started taking our advice and leaving, idk if they quit cause they wanted to make it home alive or if their commander let them.   But yeah, one dude got pulled into the crowd and slammed on the ground on his back and his club, pepper spray, cuffs, radio everything got ripped from his belt, somehow I took out my baton and got right down in his face and screamed just go back home then stood up offered him a hand to get up and give him his radio back cause I had that lol and he turned and walked away and as far as I know left.   I'm pretty sure dude thought he was gonna die that day lol.

After his arrest, Kasper was also recorded in a conversation from jail.   In the conversation, Kasper described the image of himself holding the can of bear spray against officers as making him look "like a fuckin badass."

## III.   THE CHARGES AND PLEA AGREEMENT

On April 29, 2022, a federal grand jury returned an indictment charging Kasper with six counts, including Assaulting, Resisting, or Impeding Certain Officers or Employees, in violation of 18 U.S.C. § 111(a)(1).   On September 15, 2023, Kasper was convicted of that offense based on

10

a guilty plea entered pursuant to a plea agreement.

## IV.    STATUTORY PENALTIES

Kasper now faces sentencing on Assaulting, Resisting, or Impeding Certain Officers or Employees, in violation of 18 U.S.C. § 111(a)(1).   As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, he faces up to 8 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, restitution, and a mandatory special assessment of $100.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).   The government agrees with the Guidelines analysis as stated in the Presentence Report (PSR), which is fully consistent with the Guidelines calculation in the plea agreement:

Count Two: 18 U.S.C. § 111(a)(1)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a)[2] | Base Offense Level | 14 |
| U.S.S.G. 2A2.2(b)(2) | Use of Dangerous Weapon | +4 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |
| | **Total** | 24 |
| Acceptance of responsibility (U.S.S.G. §3E1.1) | | -3 |
| **Total Adjusted Offense Level:** | | **21** |

*See* Plea Agreement ¶ 5(A); PSR ¶¶ 34-44.

---

[2] U.S.S.G. § 2A2.2 applies by cross-reference from Section 2A2.4(c)(1) (Obstructing or Impeding Officers), which directs that Section 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault.

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria.   Section 4C1.1 will be in effect at the time of sentencing in this matter, but it was not considered at the time the parties entered into the plea agreement.   However, Section 4C1.1 does not apply in this case because the offense of assault involved both violence and credible threats of violence and the possession of a dangerous weapon.   The Statement of Offense, thus, sets forth that "[t]he defendant admits that the chemical spray he used was a dangerous weapon as that term is defined in the U.S. Sentencing Guidelines Section 1B1.1 note 1(E)."   Statement of Offense ¶ 13.   The use of a dangerous weapon was also stipulated as part of the sentencing factors in the Plea Agreement, and that offense characteristic was found in the PSR.   Plea Agreement ¶ 5A; PSR ¶ 36.   The government is aware of at least two cases in which courts have rejected the application of § 4C1.1 to January 6 defendants who engaged in violence, *United States v. Gundersen*, 21-cr-137 (RC) and *United States v. Baquero*, 21-cr-702 (JEB).

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed.   PSR ¶ 49.   Accordingly, based on the government's calculation of the defendant's total adjusted offense level, after acceptance of responsibility, at 21, Kasper's Guidelines imprisonment range is 37 to 46 months' imprisonment.   The defendant's plea agreement contains an agreed-upon Guidelines range calculation that mirrors the calculation contained herein.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Kasper's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis.   Kasper was on the front lines of that attack and contributed to it by assaulting law enforcement officers with a dangerous weapon.   The nature and circumstances of Kasper's offense were of the utmost seriousness, and fully support the government's recommended sentence of 41 months incarceration.

### B.  Kasper's History and Characteristics

Although the government agrees with the PSR that Kasper has no criminal history points, PSR ¶¶ 47-48, this is not Kasper's first encounter with the criminal justice system.   *See* PSR ¶¶ 45-46, 53-55.   The PSR reports that he is currently facing a misdemeanor charge in Wisconsin for disorderly conduct, arising out of a 2019 domestic disturbance.   PSR ¶ 52.   As an adult, Kasper has two ordinance violations for underage drinking in 2019.   In addition, Kasper was arrested in February 2021, as the suspected intoxicated driver of a crashed truck, although it does not appear that the incident led to criminal charges.   PSR ¶ 56.   The PSR also describes some substance abuse issues, but no positive drug screenings since his arrest in this matter.   PSR ¶ 68.   While his assault on officers on January 6 is his most serious offense, Kasper's history of disrespect for the

13

law, as evidenced by his arrests and violations, weighs in favor of a lengthy term of incarceration.

     **C.**     **The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration.   Kasper's criminal conduct on January 6 was the height of disrespect for the law and law enforcement officers.   See United States v. Cronin, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building.   What this was was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.").

     **D.**     **The Need for the Sentence to Afford Adequate Deterrence**

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[3] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.

---

[3] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

14

Kasper's actions on January 6, 2021 and afterward evince a person who is aggressively willing, even eager, to threaten, instill fear, and endanger the lives of others, including law enforcement officers, when it suits his interests.   His decision to bring a very dangerous chemical spray to the riot on January 6, 2021 shows that he anticipated conflict on January 6 and that it might include a scenario in which he would have the opportunity to engage in an act of violence. Indeed, Kasper repeatedly sprayed dangerous chemicals at officers, and, far from being concerned for their safety, he found "definitely something satisfying about pepper spraying cops in riot gear and watching them run from you like a bitch."

Kasper's social media posts confirm that he eagerly and enthusiastically supported, and joined, the attacks on officers when he saw the riot unfolding in front of him.   He proudly broadcast his actions, wanting others to know that he was an aggressor, even a leader, in a violent mob.   He bragged that he had his "own militia," "we fucking took over Congress," and "it was my group that busted the first gate and kept chasing the cops down."

There is a strong need to deter Kasper from other criminal acts because, as evidenced by his actions and social media posts, he wanted to assault officers.   He found "something satisfying" in it.   It made him feel that he was "a fuckin' badass."   Further, the strong need for deterrence remains even if Kasper attempts to show remorse in his sentencing memorandum or at the sentencing hearing.   Against any last-minute expression of remorse, this Court should heavily weigh Kasper's social media statements that celebrated causing pain and fear in others, even after January 6 had passed.   *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't

come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan).   Kasper attacked officers and then enthusiastically posted about endangering them and causing them to fear for their lives.   Kasper's celebration of January 6, and lack of remorse in the days that followed, presents a strong need for specific deterrence.

E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate."   *Rita v. United States*, 551 U.S. 338, 349 (2007).   As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'"   *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m).   In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards."   *Kimbrough*, 552 U.S. at 108 (cleaned up).   Accordingly, courts must give "respectful consideration to the Guidelines."   *Id.* at 101.

16

### F.      Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).   In short, "the Sentencing Guidelines are themselves an anti-disparity formula."   *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021).   Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Daniel Leyden*, 21-cr-314 (TNM), Sent. Hrg. Tr. at 38 ("I think the government rightly points out generally the best way to avoid unwarranted sentencing disparities is to follow the guidelines.") (statement of Judge McFadden); *United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a).   After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing

judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012).    The "open-ended" nature

of the Section 3553(a) factors means that "different district courts may have distinct sentencing

philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every

sentencing decision involves its own set of facts and circumstances regarding the offense and the

offender."    *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district

courts can and will sentence differently—differently from the Sentencing Guidelines range,

differently from the sentence an appellate court might have imposed, and differently from how

other district courts might have sentenced that defendant."    *Id*. at 1095.    "As the qualifier

'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when

warranted under the circumstances."    *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[4]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail

'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses

and offenders similarly."    *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A

sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[5]

---

[4] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than
overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP),
Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the
seriousness of [the defendant's] conduct because it does not consider the context of the mob
violence that took place on January 6th of 2021.") (statement of Judge Pan).

[5] A routinely updated table providing additional information about the sentences imposed on other
Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases.
To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL
BREACH CASES." The table shows that imposition of the government's recommended sentence
in this case would not result in an unwarranted sentencing disparity.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases, in which the defendant pleaded guilty to violating Section 111(a)(1), provide suitable comparisons to the relevant sentencing considerations in this case.

For example, in *United States v. Cody Mattice and James Mault*, 21-cr-657 (BAH), like here, the defendants traveled to Washington, D.C. and anticipated violence. They engaged officers on the front lines at the West Plaza and in the Lower West Terrace Tunnel – with Mault encouraging officers to stand aside and Mattice pulling down a section of the bike rack fencing — and led the mob that penetrated the police line in the West Plaza. Like Kasper, the defendants assaulted officers with chemical irritants, and, like Kasper, both defendants had a criminal history category of I. The court sentenced both defendants to 44 months' incarceration. Likewise, in *United States v. Howard Richardson*, 21-cr-721 (CKK), the defendant also joined in storming the police line on the West Terrace. Richardson struck an officer three times with a metal flagpole and later helped a group of rioters force a large metal billboard into the line of officers. The court sentenced Richardson, who had a criminal history category of I, to 46 months' incarceration, even as it recognized and considered that he quickly accepted responsibility and entered an early guilty plea.

In *United States v. James Robert Elliott*, 21-cr-735-RCL, the defendant also assaulted officers on January 6. He struck officers with a flagpole and communicated about his actions in

19

text messages.   The defendant also had a criminal history category of I, and this Court sentenced him to 37 months' incarceration.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."   *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[6]   Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b).   At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here.   The officer victims in this case did not suffer bodily injury as a result of Kasper's assault. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Kasper must pay $2,000 in restitution, which reflects in part the role

---

[6] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

Kasper played in the riot on January 6.[7]   Plea Agreement at ¶ 12.   As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05 in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023.   *Id.*   Kasper's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities.   *See* PSR ¶ 96.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 41 months' incarceration, 3 years' supervised release, a special assessment of $100, and restitution in the amount of $2,000.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:    */s/Christopher Brunwin*
CHRISTOPHER BRUNWIN
Assistant United States Attorney
California State Bar Number 158939
312 N. Spring Street
Los Angeles, California 90012
(213)894-4242
Christopher.Brunwin@usdoj.gov

---

[7] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).