IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | Case No.: 22-cr-148-RCL |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | DEFENDANT'S SENTENCING |
| RILEY KASPER, ) | MEMORANDUM |
| ) | |
| Defendant. ) | |

Riley Kasper, through counsel, hereby submits the following sentencing memorandum.

### I. Witnesses

Mr. Kasper does not anticipate calling any witnesses at the sentencing hearing.

### II. Exhibits

Mr. Kasper anticipates submitting the following exhibits at the sentencing hearing:

A. Reference letter from Ari Seiff

B. Reference letter from Jonathon Piff

### III. Issues

As stipulated to in the plea agreement, the Defendant's advisory guideline range is 37 to 46 months of imprisonment. Docket Nos. 46-48. The United States Probation Office (Probation) adopted this range as identified in the Presentence Investigative Report (PSR). Docket No. 56; PSR ¶¶ 35-44 and 78.

For the forthcoming reasons, a sentence below the guideline range or, alternatively, at the bottom of the range is sufficient to achieve the aims of 18 U.S.C. 3553(a).

A. The Court Should Sentence The Defendant To 34 Months Of Imprisonment; Alternatively The Court Should Sentence The Defendant To 37 Months Of Imprisonment

Writing straight to the point, the PSR, pursuant to § 3553(a)'s command, identified several characteristics that "would warrant a downward variance from the guideline range." PSR ¶ 95.

The Defendant is still only 25 years old and was just 22 years old when he engaged in the instant offense conduct. Id; PSR ¶ 53. The Defendant's age at the time of the offense, and corresponding lack of full maturity arguably contributed to the thinking errors that caused him to drive to Washington, D.C. in the first instance. PSR ¶¶ 20. His immaturity is reflected by the fact that instead of remaining in Wisconsin with his child and child's mother, he drove to this District.[1] Id.; PSR ¶¶ 53-57.

But, in contrast to who the Defendant was then, today he is the devoted father of a four-year-old daughter with whom he resides, alongside the child's mother, his significant other of eight years. ¶¶ 56, 95; Exhibit B.

To further contrast who the Defendant has become subsequent to his offense conduct, the Defendant has since applied himself to his trade in an effort to better his family's circumstances. Exhibit A (reflecting that the Defendant has exhibited an "exceptional work ethic, strong sense of responsibility, and unwavering reliability" at his job); and Exhibit B (reflecting the Defendant's journey to becoming a homeowner).

---

[1] It is better, of course, that the Defendant did not bring his child and significant other with him.

2

It is sensible to write about the Defendant's efforts toward self-rehabilitation because the Defendant's offense conduct was arguably a (criminal) manifestation of some misguided feeling of disenfranchisement. To the extent that the Defendant's actions were the symptom of his feelings of ostracization, the probability of his recovery from such feelings is increased through his residence in a home he purchased for himself and his family in August of 2023. Exhibit B; PSR ¶ 56.

The thinking errors that supplied fuel to the Defendant's misplaced anger undoubtedly stem from his childhood when he suffered from parental abuse and lived in an unstable home environment. PSR. ¶ 53. In spite of the Defendant's difficult childhood, his juvenile history is minimal. PSR ¶¶ 41-42. The dissonance between the quality of the Defendant's childhood and the absence of any meaningful delinquency indicates that the instant conduct is the exception to the Defendant's rule.

No doubt due to the disharmony between the Defendant and his parents, he has financially supported himself since age sixteen. PSR ¶¶ 54, 66. The degree of self-reliance displayed by the Defendant at such a relatively young age is inconsistent with the episodic dependence on demagoguery² from which the Defendant suffered at the time of the instant

---

² The thousands of rioters who marched to the Capitol believed that the 2020 Presidential Election's results had been falsified, and that certification by the U.S. House of Representatives and U.S. Senate must be stopped. This belief was nurtured by external forces. Specifically, at the invitation of the then-President of the United States, thousands of people traveled to
Washington D.C. to attend the "Stop the Steal" rally. There, many prominent people spoke, including, sitting members of Congress, the President's attorney, and the President himself. The speakers lamented that the election was stolen from them. Then, at the end, the President implored his audience to march to the Capitol. The Defendant was in attendance.

conduct. And, the Defendant's capacity for self-sufficiency at 16 is consistent with his prospective ability to not make the same kind of mistakes in the future.

The Defense further notes that the Defendant's hourly wage serves as the primary source of income for his family. PSR ¶¶ 68 and 70. The observation that the Defendant's imprisonment will have a negative impact on his family's well-being is not by itself a basis for leniency; the Defendant understands, more acutely than anyone else, that the negative impact from his imprisonment is his fault and his alone. But, this observation is cause to believe, however cautiously, that upon his release from federal prison the Defendant will resume his recent work ethic and family-centered lifestyle, and avoid the sort of thinking errors that allowed his feelings of ostracization to reach the point that they did on January 6th. A lesser sentence, one below the guideline range, will sooner ensure the Defendant's return to his place of employment and, furthermore, sooner emphasize the prioritization of his young daughter.

Nor will imprisonment dampen the Defendant's current spirit of hard work and family. After all, his response to his neglectful parents' financial strains in his teenager years was to save money to help his parents pay their monthly expenses and mortgage until his parents were able to move elsewhere. PSR ¶ 54. A colorable takeaway from this is that the Defendant possesses the capacity to not only take ownership of and bear the responsibility for himself, but others as well (even those who might not deserve it). This characteristic ought to weigh in favor a shorter sentence. See § 3553(a).

Moreover, the Defendant's ability to succeed on this Court's supervised release (sooner rather than later) is strongly suggested by the absence of criminal convictions in his history, and his (mostly) successful performance on this Court's pretrial supervision. See PSR ¶ 12.

Equally important is that a lengthy period of incarceration is not necessary to deter the Defendant. As this sentence will represent his first sentence to imprisonment, less time is required to discourage recidivism.

None of the above is intended to justify or excuse the Defendant's crimes. Neither is it intended to even remotely suggest that anyone else is to blame for the Defendant's actions. The Defendant knows, like everyone else, that he is responsible and accountable for what he did. The above is merely intended to help the Court determine, as § 3553(a) directs, a just sentence for the Defendant's offense.

Overall, the Defendant's history and characteristics support that a sentence slightly below the guideline range would be a sufficient term of incarceration under 18 U.S.C. § 3553(a).

Alternatively, and acknowledging the seriousness of his conduct, the Defendant's respectfully submits that a sentence of 37 months' imprisonment, the bottom of his advisory range, is a sentence sufficiently serious to satisfy the goals of § 3553(a).

Beyond the aforementioned history and characteristics which favor a downward variance (or alternatively, a sentence at the bottom of the advisory range), the Defendant's actions are relatively less culpable than other individuals sentenced under 18 U.S.C. § 111(a)(1), and who fall within the same (or similar) guidelines ranges as a result of their actions at the United States Capitol on January 6, 2021. Unlike many individuals present, the Defendant was not associated with any extremist groups.[3] PSR ¶ 58. Additionally, the Defendant was not directly involved in the instant conduct where individuals pushed down police barricades. PSR

---

[3] https://www.voanews.com/a/2020-usa-votes_researchers-more-dozen-extremist-groups-took-part-capitol-riots/6200832.html

¶¶ 21-22.  There is also the obvious absence of aggravation due to the Defendant's decision to not enter Capitol Building itself.  A single, isolated assault constitutes the bulk of the Defendant's offense.

In comparison, one defendant who shoulders greater culpability than this Defendant received a sentence of 36 months of incarceration and 36 months of supervised release.  *United States v. Landon Kenneth Copeland*, 21-cr-570 Docket No. 49.  Kenneth Copeland's estimated guideline range was 41 months to 51 months of incarceration because, unlike the Defendant in the present case, he fell into a criminal history category of II.  *Id*. at Docket No. 33. In contrast with the Defendant, Copeland was spotted standing at the very front of the police line.  Id. at Docket No. 34.  At one point, he pushed another rioter into the police, and the officer ultimately felt to the ground and sustained injuries.  *Id.*  Then, he grabbed an officer's riot shield and "pushed back against the police line." *Id.*  Perhaps most importantly, Copeland "charged law enforcement officers with the" barricade after attempting to pull the barricade down.  *Id.* at 4-5.  He was also seen "pushing and throwing" the barricade "into multiple officers."  *Id.*  Copeland's actions were ultimately far more involved and physical than the Defendant's.  It arguably follows that the Defendant should receive a lesser sentence than Copeland.  Alternatively, no more than 37 months' imprisonment is appropriate here in order to avoid any unwanted sentencing disparities between Copeland and the Defendant.

There are several other cases, in which the facts include more severe measures than the Defendant's, in which those defendants' received sentences at the lower end of the exact same guidelines range as this Defendant.  Dillon Herrington, who was also convicted under 18 U.S.C. § 111(a)(1), received a sentence at the bottom of the guidelines range: 37 months of

6

incarceration, 36 months of supervision, and $2,000 in restitution.  *United States v. Dillon Herrington*, 23-cr-199 at Docket No. 30.  Unlike the Defendant, Herrington was captured on video attempting to hit officers with various objects on several occasions, including "a four-by-four piece of lumber" which he "launched" at an officer.  *Id.*, at Docket No. 24.  Indeed, Herrington was so out of control that other rioters sought to restrain him.  *Id*.  Unlike Herrington, the Defendant engaged in a single, isolated assault.  And unlike Herrington, the Defendant regained control of himself after the momentary loss of control that resulted in the discharge of the spray.  PSR ¶ 22-23.  Surely, the Defendant deserves no more time than Herrington.

There is another 18 U.S.C. § 111(a)(1) conviction, that fell within the same advisory range as the Defendant's range, which resulted in an incarceration period of 37 months, 24 months of supervised release, and $2,000 in restitution.  *United States v. James Robert Elliot*, 21-cr-735 at Docket No. 43.  Elliott arrived at the capital wearing a bullet-proof vest and "hard-knuckle gloves."  *Id*. at Docket No. 27.  At one point, Elliot was seen standing in front of a crowd of protestors on an elevated scaffolding "and yelled a phrase inspired by a battle cry from [a] movie."  *Id*.  Additionally, Elliott wielded a flagpole and thrust it toward a line of officers, ultimately hitting one.  *Id*.  Unlike Elliot, the Defendant did not wield as heavy an object capable of inflicting as great and long-lasting damage as a flagpole.  Furthermore, he did not specifically incite other individuals to push past barricades or otherwise advance towards officers.[4]

---

[4] Like Elliot, the Defendant pled guilty and expressed remorse for his conduct (a single assault).  *See Elliot*, at Docket No. 41.  This Defendant is also like Elliot in that they are both fathers of young children, and are crucial to their families' financial position.  *Id*.

Withstanding the advisory nature of the guidelines, and that § 3553(a) is the final command for sentencing, it is also worth comparing the Defendant's matter to Riley Williams' case. After Williams was convicted by jury, the Government wrote:

> The evidence at trial showed that Riley Williams was acutely aware of the constitutional significance of January 6 and intent on disrupting Congress' certification of the 2020 election by any means necessary. Williams followed through on that goal by invading the U.S. Capitol building, directing other rioters, organizing violence and physical resistance against law enforcement officers, and stealing—and helping to steal—items from Speaker of the House Nancy Pelosi's office. Everywhere she went, Williams acted as an accelerant, exacerbating the mayhem. Where others turned back, she pushed forward. When officers blocked her path, she recruited other rioters, especially larger men wearing helmets and body armor, gathered them together, and pushed them forward like a human battering ram, using the mob as a weapon to break through the police lines. The officers she faced off with were among those injured. Then, in the 12 days between the riot and her arrest on January 18, 2021, Williams repeatedly destroyed evidence and tried to evade law enforcement officials: she deleted her social media and communication accounts, instructed others to delete messages and take down videos from the internet, reset her iPhone, switched cellular phones, and used advanced software to wipe her computer.

*United States v. Williams*, 21 CR 618 ABJ. Docket No. 139 at 2. Williams' received a sentence of 36 months' imprisonment. *Id*., Docket No. 152. Even assuming that the Court determines that a downward variance is not appropriate, the Defendant respectfully submits that his conduct and acceptance of responsibility deserves no more one month above Williams' sentence.

Yet another case suitable for comparison is *United States v. Scott Fairlamb*, 21 CR 120. Fairlamb stormed the police on the West Terrace, armed himself with a police baton, and screamed "What Patriots do? We fuckin' disarm them and then we storm the fuckin' Capitol!." *Id*. at Docket No. 50. Fairlamb then brandished the police baton as he entered the U.S. Capitol. *Id*. Fairlamb continued to harass a group of officers who were trying to get through the rioters

8

in order to join another group of officers. *Id*. Fairlamb dared to push and then punch one of the officers in their face shield. *Id*. Fairlamb received a sentence of 41 months, the bottom of his advisory range. *Id*. at Docket No. 57. This Defendant also deserves no worse than a bottom of the guideline range sentence.

While recognizing the severity of the Defendant's actions and that there is no excuse for his actions, the Defendant's history and characteristics nonetheless weigh in favor of a downward variance under § 3553(a).

The Defense observes that many defendants who face similar guideline ranges request a significant downward variance. These same defendants simultaneously aver their remorse. Reasonable minds can agree to disagree over whether a disconnect lies between affectations of remorse and pleas for such substantial downward variances. Regardless, this Defendant's mindful request for a modest downward variance of 3 months, demonstrates that he truly understands that his conduct that day was (and remains) deserving of a lengthy sentence in federal prison. Certainly, this appreciation evidences a more commensurate measure of acceptance of responsibility.

In accord with Probation's identification of grounds in the Defendant's history and characteristics which support a downward variance, the Defendant iterates his plea for a downward variance to 34 months' imprisonment.

Alternatively, the Defendant respectfully asserts that a sentence at the very bottom of the range is sufficient, but not greater than necessary to achieve the goals of § 3553(a).

<u>IV. Conclusion</u>

For the aforementioned reasons, the Defendant respectfully requests that the Court vary downward form the advisory guideline range to 34 months or, alternatively, sentence the Defendant to 37 months' imprisonment, the bottom of the applicable advisory guideline range.

In addition, the Defendant prays that the Court impose a not-greater-than necessary term of supervised release and grant him the privilege of self-surrender[5].

FEDERAL DEFENDER'S OFFICE
222 Third Avenue SE, Suite 290
Cedar Rapids, IA  52401-1509
TELEPHONE: (319) 363-9540
TELEFAX: (319) 363-9542

BY: <u>/s/  Christopher J. Nathan</u>
CHRISTOPHER J. NATHAN
christopher_nathan@fd.org
ATTORNEY FOR DEFENDANT
CHRISTOPHER J. NATHAN

CERTIFICATE OF SERVICE

I hereby certify that on January 30, 2024, I electronically filed this document with the Clerk of Court using the ECF system which will serve it on the appropriate parties.

By:  <u>/s/ Angie McClain</u>

---

[5] The Defense respectfully suggests a two-week self-surrender date to the district supervising his pretrial release.